**COMMONWEALTH of Pennsylvania,**
**Appellee,**

v.

**Clinton HITNER, Appellant.**

Superior Court of Pennsylvania.

Submitted July 24, 2006.
Filed Oct. 27, 2006.

Christa L. Schott, Doylestown, for appellant.

Scott A. MacNair, Asst. Dist. Atty., Doylestown, for Com., appellee.

BEFORE: HUDOCK, STEVENS, and TAMILIA, JJ.

**OPINION BY STEVENS, J.:**

¶ 1 This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Bucks County following Appellant Clinton Hitner's conviction for two counts each of rape,[1] involuntary deviate sexual intercourse,[2] kidnapping,[3] sexual assault,[4] and false imprisonment,[5] and the trial court's determination that Hitner is a sexually violent predator pursuant to Pennsylvania Megan's Law III, 42 Pa. C.S.A. §§ 9791–9799.8.[6] Hitner contends (1) the Commonwealth failed to prove by clear and convincing evidence that Hitner is a sexually violent predator, (2) the trial court erred in denying Hitner's constitutional claims without holding an evidentiary hearing, (3) the trial court abused its discretion in sentencing Hitner, and (4) the jury's verdict was against the weight of the evidence.[7] We affirm.

¶ 2 The relevant facts and procedural history are as follows: Hitner was arrested in connection with the sexual assault of two women, and he proceeded to a jury trial. During the jury trial, the following was elicited:

Michael Zukowski, a tractor-trailer driver, testified that on January 13, 2004, he "exited off of 13 onto Route 1 and saw a woman unclothed in the middle of the highway flagging (me) down." Zukowski related that he immediately "pulled off to the side of the road ... The lady came to my door. I opened

---

1. 18 Pa.C.S.A. § 3121(a).

2. 18 Pa.C.S.A. § 3123.

3. 18 Pa.C.S.A. § 2901.

4. 18 Pa.C.S.A. § 3124.1.

5. 18 Pa.C.S.A. § 2903.

6. "[T]he General Assembly amended Megan's Law II in 2004, with an effective date of January 24, 2005 (known as "Megan's Law III")." *Commonwealth v. Mullins*, 905 A.2d 1009, 1021 n. 6 (Pa.Super.2006). We conclude Hitner is subject to the newly-amended Megan's Law III. *See Commonwealth v. Benner*, 853 A.2d 1068 (Pa.Super.2004) (holding that most current version of Megan's Law is applicable so long as the defendant remains in the custody of correctional authorities to discharge any part of his sentence for the sex offense).

7. Hitner raises two specific weight of the evidence claims.

the door. She said....' I've just been through hell.' ... I got out of my car into the trunk and gave her a blanket." N.T. 2/2/05 at 54–55. Michael Zukowski further testified:

She (L.H.) said she had been picked up in Kensington ... (and) was forced to perform sex in a car, orally. She was then in the trunk and taken to a home where she was raped and tortured. She showed me the back of her shoulder having been burned by cigarettes ... She was then taken to the woods where she was strangled. She fought the man off, and he grabbed her by her hair and pulled her down the highway. Her hair was missing, clumps of hair were missing on her head. Her head was matted and (there was) blood on her forehead....She was terrified ... She was crying the whole time. I told her she was very brave and that she had just fought for her life and won.

N.T. 2/2/05 at 54–55.

Zukowski testified that "she asked me to take her to the hospital. I thought it was better just [to] get her to the police, the bridge police ... I went to the tollbooth ... they sent for an ambulance ... I stayed with her." Zukowski testified that [L.H.] "said she had a description of her attacker and a car ... (and) she could show or know where the house would be, the car, and part of the license plate." *Id.*

\* \* \*

Officer Wayne Apice of the Morrisville Borough, Bucks County, Police Department testified that on January 13, 2004 at approximately 4:28 a.m., he responded to the area of the Route 1 Toll Bridge:

[A]n officer from the bridge commission reported that they had a woman

there that was raped ... I seen a woman in the front seat of a vehicle. She was crying. She (L.H.) was very upset. She had no clothing on. She was clinging to an article of material as she was balled up in the front seat of the car ... She told me that she was picked up down in Philadelphia ...., at which point this individual raped her repeatedly.

N.T. 2/2/05 at 73.

[L.H.] age forty-one (41) testified that on January 13, 2004, she "was at Kensington Avenue and Venango Street in Philadelphia ... I was standing on the corner and a man (Clinton Hitner) in a car approached me, asked me if I was "working"... I was. He said that he had $10 for a blow job. And I said, okay. And I got into the car." N.T. 2/2/05 at 83.

\* \* \*

She testified that the car that approached her on January 13, 2004, "was a Ford Tempo ... I had owned one before a few years prior to this night ... It was a four door, so I was familiar with that model car ... it was 1:30 in the morning ... from what I remembered it was, like, a maroon-type of color ... there were bucket seats with a console in between the two bucket seats." N.T. 2/2/05 at 84.

After getting into the car, [L.H.] testified that "(Hitner) had said that he wanted to go down to Richmond and Castor Avenue ... Nothing felt wrong at the time ... He was drinking a 40-ounce of beer, and we didn't talk much ... It was pretty quiet in the car. And when we got down to Richmond and Castor, he had basically passed that location."

[L.H.] further related:

(W)e continued to drive on ... (W)e came to this intersection. He had turned left, and he said "chuck the bottle." And I opened the door and chucked the bottle, and then we continued on driving. About not even quite a minute after that is when he grabbed my hair and twisted it around his hand twice and said, "suck my dick, bitch, or I'll kill you."

I couldn't move ... it was, actually, it was really hurting ... he started pulling on my hair. He was starting to go towards his part of his seat ... he told me to undo his belt and pull down his zipper, and I was so nervous, and I started fighting.

And I said, "I'm not sucking your dick. I don't care." And I started fighting with everything I had where I was punching and kicking and moving ... He was driving the car and holding me at the same time. At the time I was punching and kicking him[,] he had my hair turned around his hand and holding my neck and kinked my neck, but I still fought. I couldn't get loose, and I fought with everything that I had.

At one point[,] he actually—I thought I could get out of the car and jump, but he had my hair so tight in his hand there was no way. And I actually got to a point where my feet were dragging alongside the car with the door open and him holding my head, my hair, inside of the car, and I was like this. And he's, "if you want to jump, bitch, I'm going 40 miles an hour." And I thought I'd die if I did jump because going bald at that point ... wasn't a factor. It was just to get away from him. He was like Satan. [H]e kept my head twisted and kinked and down into his crotch area.

[L.H.] testified that she pushed her feet outside the car:

I had opened the door. I tried—I was going to jump. I was going to jump, but the rate of speed he was going, I was, like, not sure if I was going to live through that ... Yeah, I just pulled on it because I did not want to be pushed out, either ... We fought a little more. We passed a cop, in fact, and I tried honking the horn, and I did, but the cop didn't take notice. And at the speed we were going, he still didn't take notice. And Clinton Hitner started laughing ... "the cop didn't see you. Now I can do whatever I want to do to you and nobody is going to know."

N.T. 2/2/05 at 84–88.

[L.H.] testified that she had no prior contacts with Clinton Hitner before the morning of their encounter. She related how Hitner drove from Philadelphia to Bucks County:

I knew from the acceleration of his car, the speed of the car was going faster ... We must have gone on 95 because we were close to the area of 95 ... During that trip on 95 is when he exposed himself and made me start going down on him.

And after all the fighting he kept saying, "now I got you. I am going to kill you. You should not have fought me, you know. That was the biggest mistake you could have made was to fight me." And he said, "I want you to take your clothes off." It was during oral sex on him ... I had to start getting undressed. I had to take my sneakers off, my pants off. My jacket and everything was sitting on the front seat of the car ... totally naked with just my socks on my feet ...

N.T. 2/2/05 at 89–90.

* * *

[L.H.] related that after they left the Route 413 exit:

We drove for about five or ten minutes ... (H)e pulled into a driveway ... He made me have intercourse with him ... he had me by my head ... and he pulled me up and said, "I want you to fuck me, and I want you to get on top of me." And I did, and at the time that I got on top of him I had accidentally beeped the horn with my butt. And I don't know what happened, but all of a sudden he just wanted to get up and leave. And he said, "get off of me." I got off him.

He said, go back down on me, as he had my hair in his hand, and pulled out of the driveway. We went down some dirt ... dark road, and he pulled me out of the car and said, "You go in the trunk." He said, "I'm stopping for gas, and if you make any noises, I will kill you." So when he opened the trunk he pushed me in the trunk ... I remember hurting my legs, my shins. And I got in there and he slammed the trunk closed.

And I remember finding a sheet in there ... I pulled that over top of me at the same time. I was so cold and scared ... He kept accelerating the gas and stamping the brake, accelerating, laughing ... "I got you. Nobody is going to hear you so don't you try and holler because once I get you out I'll kill you." ... After he went to get the gas he kept on—"I hear you, bitch. Don't make a noise, bitch. I'll kill you when you get out. I'll kill you."

N.T. 2/2/05 at 92–94.

[L.H.] testified that she was inside the trunk for [approximately twenty minutes. After he let her out:]

He had me by my hair and he started driving, and he said, "suck my dick and don't stop. Don't talk. Don't cry, or I'll kill you."

It was continuous ... intercourse with him in the driveway, and until the end where I was not able to go any further because it was, like, hours had passed, and so I was too exhausted and tired ... I had to masturbate him then.

* * *

[After] he finally ejaculated ... I got out of the car. He said, "I should keep you. I should keep you."

And I got out of the car and he pulled off with his lights off, and I couldn't get a tag number ... I[saw] a fence and I went to the fence and I scaled the fence, climbed it, jumped over it, ran to the highway, and started flagging down cars to help me. And there was about four or five cars that passed before the one gentleman (Michael Zukowski) finally stopped and picked me up to help me ... It was freezing cold.

* * *

[L.H. testified that Hitner put cigarettes out on her back ... and] estimated the incident of January 13, 2004 lasted "at least three, three-and-a-half hours." She stated, "He was laughing. He goes, Oh, you're my little "Heroin Ho." ... My little junkie." N.T. 2/2/05 at 108.

* * *

[L.H.] also testified that she saw Clinton Hitner exactly one week later on January 20, 2004 [and she called the police after she saw Hitner pick up another girl (J.S.).]

\* \* \*

Debra Condon, a Sexual Assault Nurse at Frankford–Bucks Hospital testified that on the morning of January 13, 2004, she performed a physical examination upon [L.H.] She observed that [L.H.] "had burns on the back ... and shoulder, a broken left index finger which was bleeding, [and her hair had been pulled out in clumps.]" N.T. 2/3/05 at 31–37.

\* \* \*

J.S., age twenty-three (23), testified that on January 20, 2004, ... she "saw the defendant sitting in his car, and he motioned me to come over ... It was a ... red or burgundy ... Ford Taurus ... He wanted to know if I could go with him." She related that after getting into Hitner's car "he pulled out of the parking lot. We started driving down Ontario Street, and he asked me if, you know, if I like to party...." N.T. 2/4/05 at 4–8.

She testified that "while we were driving ... I got a little suspicious when he said something about going over to Richmond and Thompson ... He grabbed me by my hair ... and forced me to perform oral sex." N.T. 2/4/05 at 4–10.

\* \* \*

She also testified that Hitner told her, "You can get out of the car here, or you can come back with me to my house." When she stated, "I'm going to get out of the car," Hitner said, "I think I'm going to keep you." [J.S.] related that Hitner then drove her to his house in Falls Township, Bucks County.

Trial Court Opinion filed 2/24/06 at 2–13.

¶ 3 At his house, Hitner forced J.S. to engage in vaginal and anal intercourse and he began shaving her head stating, "You AIDS whore, I'm going to make you really look like you have AIDS now. I'll see you in hell." N.T. 2/4/05 at 8. Hitner then gave J.S. a sweatshirt, dropped her off at the train station, and gave her two dollars. N.T. 2/4/05 at 22–23. J.S. called the police and provided the police with the name of the street upon which Hitner lived, as well as his car's license plate number. N.T. 2/4/05 at 22–23. J.S. testified that Hitner had told her "about some girl earlier he had picked up and ripped off for a 20 bag of coke...." N.T. 2/4/05 at 27.

¶ 4 Officer John Finby of the Tullytown Borough, Bucks County Police Department, testified that on January 20, 2004, he arrived at the Levittown train station to meet with J.S. He related that J.S. "provided us with a license plate on the car that was used to drop her off at the train station ... We drove by the house. She recognized the same house, same car, [and] the same tag." N.T. 2/7/05 at 27.

¶ 5 The police executed a search warrant at Hitner's house on January 20, 2004, and found hair, later identified as belonging to J.S., in the bedroom, in the bathroom, and on an electric razor. The police also executed a search warrant for Hitner's vehicle and found hair, later identified as belonging to L.H. In addition, semen collected from L.H. and J.S. was determined through DNA testing as being that of Hitner.

¶ 6 Based on all of the aforementioned, the jury convicted Hitner of the offenses indicated *supra,* and on October 6, 2005, he proceeded to a Megan's Law III hearing. Dr. John Shanken–Kaye, who is a psychologist and member of this Commonwealth's State Sexual Offenders Assessment Board, opined that Hitner is a sexually violent predator. N.T. 10/6/05 at 9–10. He specifically indicated that Hitner has a mental abnormality of sexual sadism, he

has an antisocial personality disorder, and he engaged in predatory behavior with both victims, who were strangers to him prior to the rapes. N.T. 10/6/05 at 9–10. He concluded that Hitner is "highly likely" to reoffend. N.T. 10/6/05 at 10.

¶ 7 Dr. Shanken–Kaye testified that an antisocial personality disorder is characterized by a lifetime history of failure to conform one's conduct to the norms of society, a callous disregard for other's feelings, and no remorse for one's crimes. N.T. 10/6/05 at 10. Dr. Shanken–Kaye testified that "sexual sadism" is defined as an individual who has intense and recurring sexual compulsivity or sexual fantasy around the issues of degradation, humiliation, and pain towards another which causes sexual gratification. N.T. 10/6/05 at 12. He concluded Hitner's actions towards the victims involved an excess of force and served no other purpose than to humiliate, degrade, and cause pain to the victims. N.T. 10/6/05 at 12. He indicated the diagnosis of sexual sadism was "based upon the extreme nature of the sadism in two individual cases that were separated by time." N.T. 10/6/05 at 33.

¶ 8 In rendering his opinion, Dr. Shanken–Kaye considered the fact there were multiple victims, excessive force was used, gratuitous violence beyond that needed to rape the victims was used, the victims were strangers, and the age of the victims. N.T. 10/6/05 at 14–15. Dr. Shanken–Kaye considered Hitner's extensive juvenile record and adult criminal history. Dr. Shanken–Kaye indicated that "individuals who have criminal case histories are more likely to reoffend of all types of criminal behavior, including sexually violent acts." N.T. 10/6/05 at 16. Dr. Shanken–Kaye also considered Hitner's relatively young age of twenty-six, the fact he had previously pled guilty to using illegal drugs, and the fact he asked one of the victims for heroin. N.T. 10/6/05 at 18–19. Regarding Hitner's history, Dr. Shanken–Kaye observed "a pattern of law breaking, violation of the rights of others, and failure to conform his behavior to the norms of society or to the restrictions of parole." N.T. 10/6/05 at 40.

¶ 9 Based on the evidence presented, the trial court concluded the Commonwealth established by clear and convincing evidence that Hitner is a sexually violent predator. The court recessed and then reconvened for sentencing. After reviewing the sentencing guidelines, hearing the victims' impact statements, and considering letters and testimony from Hitner's family, the trial court sentenced Hitner to ten years to twenty years in prison for one count of rape, ten years to twenty years in prison for one count of kidnapping, ten years to twenty years in prison for the second count of rape, and ten years to twenty years in prison for the second count of kidnapping, the sentences to run consecutively. No further penalty was imposed for Hitner's remaining convictions.

¶ 10 Hitner filed a timely post-sentence motion, which the trial court denied, and this timely appeal followed. On January 9, 2006, the trial court ordered Hitner to file a Pa.R.A.P. 1925(b) statement, Hitner filed a timely statement on that same date, and the trial court filed a Pa.R.A.P. 1925(a) opinion.

¶ 11 Hitner first contends the Commonwealth failed to prove by clear and convincing evidence that he is a sexually violent predator. Specifically, Hitner argues the Commonwealth failed to prove he suffers from a mental abnormality or personality disorder under 42 Pa.C.S.A. § 9792.[8] We disagree.

---

8. Hitner raised this issue in his post-sentence motion and court-ordered Pa.R.A.P. 1925(b)

The determination of a defendant's [sexually violent predator] status may only be made after an assessment and hearing before the trial court. In order to affirm a [sexually violent predator] designation, we, as a reviewing court, must be able to conclude that the fact-finder found clear and convincing evidence that the individual is a sexually violent predator. Our review of a sufficiency of the evidence claim is plenary. As with any sufficiency claim, we view the evidence and all reasonable inferences therefrom in the light most favorable to the Commonwealth. We will reverse a trial court's determination of [sexually violent predator] status only if the Commonwealth has not presented clear and convincing evidence sufficient to enable the trial court to determine that each element required by the statute has been satisfied.

*Commonwealth v. Dengler*, 843 A.2d 1241, 1246 (Pa.Super.2004), *affirmed*, 586 Pa. 54, 890 A.2d 372 (2005) (internal citations and quotation marks omitted).

¶ 12 42 Pa.C.S.A. § 9792 defines "sexually violent predator" as:

A person who has been convicted of a sexually violent offense as set forth in section 9795.1 (relating to registration)[9] and who is determined to be a sexually violent predator under section 9795.4 (relating to assessments) due to a mental abnormality or personality disorder that makes the person likely to engage in predatory sexually violent offenses.[10]

¶ 13 Section 9792 defines "mental abnormality" as "[a] congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons."

¶ 14 During the Megan's Law III hearing, Dr. Shanken–Kaye testified that Hitner has an antisocial personality disorder. Specifically, he testified that an antisocial personality disorder is characterized by a lifetime history of failure to conform one's conduct to the norms of society, a callous disregard for other's feelings, and no remorse for one's crimes. In supporting his opinion, Dr. Shanken–Kaye pointed to the fact Hitner showed no remorse for his crimes, he treated his victims with unusual cruelty, and he discussed Hitner's lengthy criminal record, which began with his juvenile crimes at the age of seventeen. As Hitner points out, Dr. Shanken–Kaye indicated that, generally, the statistical manuals indicate that, before a person is found to have an antisocial personality disorder, the offending conduct should have begun by the age of fifteen, and in this case, the information available to Dr. Shanken–Kaye began with Hitner's offenses at the age of seventeen.[11] However, as Dr. Shanken–

statement, and therefore, he has preserved the issue. *See Commonwealth v. Lord*, 553 Pa. 415, 719 A.2d 306 (1998) (holding issues must be raised in court-ordered Pa.R.A.P. 1925(b) statement); *Commonwealth v. Askew*, 907 A.2d 624 (Pa.Super.2006) (holding Pa. R.Crim.P. 606 sets forth the manner in which a challenge to the sufficiency of the evidence supporting a sexually violent predator determination must be made; sufficiency of the evidence claim may be raised for the first time on appeal).

9. Hitner does not contest that he was convicted of a sexually violent offense.

10. 42 Pa.C.S.A. § 9795.4 provides a list of factors to be considered when an assessor formulates his opinion regarding a defendant's sexually violent predator status. Hitner has not alleged that Dr. Shanken–Kaye did not properly consider this list of factors.

11. Hitner refused to participate in Dr. Shanken–Kaye's evaluation. N.T. 10/6/05 at 8.

Kaye testified, the lack of information indicating the diagnostic criterion began at age fifteen was outweighed by "Hitner's behavior when he was adjudicated delinquent as a juvenile, the fact his probation was revoked, the fact he was convicted of several different crimes, [and] the fact his criminal behavior continued almost very, very soon after as an adult...." N.T. 10/06/05 at 11. Dr. Shanken–Kaye indicated on cross-examination that a clinician has discretion in demanding information pertaining to a certain age limit, a clinician's judgment is crucial, and the statistical manual suggesting an age of fifteen is not mandatory in that the manual is not a "cookbook whereby items are checked off and a diagnosis made." N.T. 10/06/05 at 25.

¶ 15 Dr. Shanken–Kaye also testified at the Megan's Law III hearing that Hitner suffers from a mental abnormality of sexual sadism, and "[t]he criterion for sexual sadism is that an individual has intense and recurring sexual compulsivity or sexual fantasy around the issue of degradation, humiliation, [or] pain of another individual which causes sexual gratification." N.T. 10/06/05 at 12. In supporting his opinion that the rapes were done to satisfy Hitner sexually at the cost of degrading, humiliating, or causing pain to his victims, Dr. Shanken–Kaye indicated, *inter alia,* the force Hitner used against the victims was far in excess of what was needed to commit the rapes, he burned the victims, he pulled out or shaved the hair on their heads, he threatened to kill them, and the victims were strangers. Moreover, Hitner left L.H. outside naked and penniless on a freezing night, and he took the partially-shaven J.S. to a train station, providing her with only $2.00 with which to get home.

¶ 16 As Hitner points out, Dr. Shanken–Kaye admitted on cross-examination that, generally, the statistical manuals list as a criterion for sexual sadism that the conduct occurred over at least a six month period of time. N.T. 10/06/05 at 32. However, Dr. Shanken–Kaye indicated that such a period of time is not a requirement for making a diagnosis of sexual sadism; but rather, it is a guideline of time used by clinicians. N.T. 10/06/05 at 32–33. Based on the extreme nature of the sadism in this case, and the fact there was a separation of time between when Hitner picked up the two victims, Dr. Shanken–Kaye concluded the fact Hitner's conduct was not allowed to continue for a known six month period of time did not affect negatively Dr. Shanken–Kaye's opinion that Hitner suffers from sexual sadism.

¶ 17 Based on all of the aforementioned, we conclude the Commonwealth proved by clear and convincing evidence that Hitner suffers from a mental abnormality and/or personality disorder as defined under Section 9792. Therefore, we find Hitner's first claim to be meritless.

¶ 18 Hitner's next claim is that the trial court erred in denying Hitner's constitutional claims without holding an evidentiary hearing. Specifically, citing exclusively to the Supreme Court's decision in *Commonwealth v. Williams,* 574 Pa. 487, 832 A.2d 962 (2003) (*"Williams II "*), Hitner alleges the lack of judicial reviewability of a sexually violent predator finding renders Megan's Law II[12] unconstitutionally overbroad and excessive, and Megan's Law II is unconstitutionally vague.[13] We find no relief is due.

---

**12.** As discussed previously, we conclude Megan's Law III is applicable to this case.

**13.** Hitner also contends the review provisions of Megan's Law II are unconstitutional since the provisions place the burden of proof upon the defendant. This issue is waived since it

¶ 19 In *Williams II, supra,* the Supreme Court examined in depth Pennsylvania's version of Megan's Law ("Megan's Law II") as it existed prior to the 2004 amendments. Specifically, regarding judicial reviewability, the Supreme Court noted that Megan's Law I contained a provision whereby subsequent board review was to be conducted following an individual's designation as a sexually violent predator, however, the provision was repealed and not included in Megan's Law II. Using factors outlined in *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), the Supreme Court in *Williams II* ultimately concluded that the state's interest in protecting the public against sexually violent predators was great and the duty to register, verify, and undergo counseling were not in themselves sufficiently erroneous to qualify as punishment based upon alleged excessiveness. However, the Supreme Court noted the following regarding Megan's Law II: [14]

> [O]ne of the most troubling aspects of the statute is that the period of registration, notification, and counseling lasts for the sexually violent predator's entire lifetime. A reasonable argument could be made that, to avoid excessiveness, the Legislature was required to provide some means for a sexually violent predator to invoke judicial review in an effort to demonstrate that he no longer poses a substantial risk to the community.... Notably, however, the position that a means for subsequent judicial review is a necessary feature of any valid registration/notification scheme assumes that, given sufficient time and/or treatment, sexually violent predators can be fully cured of the mental abnormality or personality disorder [making them] likely to engage in predatory sexually violent offenses. As the record is devoid of any information concerning the prospect of successful treatment of such individuals, the presumption of constitutionality enjoyed by all validly enacted legislation remains unrebutted.

*Williams II,* 832 A.2d at 982–983 (citations and footnote omitted) (footnote added). *See Commonwealth v. Mullins,* 905 A.2d 1009 (Pa.Super.2006) (discussing *Williams II* ).

¶ 20 Subsequent to *Williams II,* in *Mullins, supra* and *Commonwealth v. Leddington,* 908 A.2d 328 (Pa.Super.2006), this Court examined the appellants' claims of lack of judicial reviewability/excessiveness and concluded that, before a finding of unconstitutionality could be found, the appellants were required to demonstrate they were cured [15] in order to merit termination of their sexually violent predator statutes. Moreover, in *Mullins,* this Court noted that Megan's Law III contains no provision comparable to the now-

---

was not raised before the trial court; but rather, the issue was raised for the first time on appeal. Pa.R.A.P. 302(a); *Commonwealth v. Howe,* 842 A.2d 436 (Pa.Super.2004).

**14.** It is this specific language in *Williams II* to which Hitner cites.

**15.** There was some dispute between the *Mullins* and *Leddington* panels as to whether petitioners are required to demonstrate they are fully cured of their mental abnormality/personality disorder or whether they merely need to show they are no longer a substantial risk

to the community in order to invoke judicial review. We continue to agree with this panel's pronouncement in *Leddington* that:

> [O]ur Supreme Court stated unequivocally that judicial review would only be necessary if a cure ... for any ... mental abnormality or personality disorder outlined in Megan's Law could be demonstrated ... Only after the need for judicial review is established would the sexually violent predator be given the opportunity to demonstrate they no longer pose a substantial risk to the community.

*Id.* at 331 n. 9 (quotations omitted).

repealed section of Megan's Law II providing for subsequent board review; however, unlike Megan's Law II, Megan's Law III does contain a provision whereby a sexually violent predator can petition for exemption from certain other notification provisions under 42 Pa.C.S.A. § 9795.5.

¶ 21 Hitner has not discussed how the changes made to the newly-enacted Megan's Law III alter the Supreme Court's reasoning in *Williams II,* and he has raised no specific constitutional challenge thereto. In any event, assuming, *arguendo,* that the change contained in Section 9795.5 does not substantially alter this panel's conclusion in *Leddington* that, pursuant to *Williams II,* judicial review would be necessary only if a petitioner could demonstrate there is a cure for his particular mental abnormality/personality disorder, we conclude Hitner has not remotely met this burden. Specifically, although he indicates the trial court should have remanded for a hearing, he indicates no evidence or witnesses he would offer on his behalf to support his claim. His bald allegation that a remand is necessary is insufficient without some offer of proof, particularly in light of the fact he did not present any expert evidence during his Megan's Law III hearing held on October 6, 2005.

¶ 22 Regarding his argument that Megan's Law II is vague, Hitner points to the following passage from the Supreme Court's opinion in *Williams II:*

> As Appellee's void for vagueness challenge was not addressed by the trial court, the matter will be remanded for consideration of this claim, any imprecision in the Act's provisions must presently be evaluated in terms of whether it renders the statute unconstitutionally punitive through excessiveness. Primarily, if the Act's impression is likely to result in individuals being Sexually Violent Predators who in fact do not pose the type of risk to the community that the General Assembly sought to guard against, then the Act's provisions could be demonstrated to be excessive in relation to the remedial purposes served ... Appellees could establish that the offender assessment is so unreliable that there will be little correlation between those ultimately deemed sexually violent predators and the class of individuals who pose the greatest risk of predation ... [A]ny conclusion that an assessment of sexually violent predator status is so arbitrary that the consequences to the individual so adjudicated constitute punishment, would have to be grounded upon credible record evidence that the enumerated criteria were non-predictive, or that assessment pursuant to them was inherently unreliable.

*Williams II,* 832 A.2d at 983–984.

¶ 23 Again, Hitner has failed to indicate how the holding in *Williams II* relates to Megan's Law III. In addition, aside from setting forth this passage, Hitner has not developed his "void for vagueness" argument in any meaningful way. He has proffered no evidence, which he would present on remand, and he has not otherwise explained his constitutional challenge. Therefore, we conclude no relief is due.

■ ¶ 24 Hitner next challenges the discretionary aspects of his sentence. Specifically, Hitner alleges the trial court erred in failing to state on the record that it gave proper consideration to the protection of the public and Hitner's rehabilitative needs in imposing a sentence which exceeded the aggravated range of the sentencing guidelines.[16] We find no relief is due.

---

16. We conclude Hitner has sufficiently raised his sentencing issue in his post-sentence motion and court-ordered Pa.R.A.P. 1925(b) statement. *See Lord, supra; Commonwealth*

The right to appeal the discretionary aspects of a sentence is not absolute. When challenging the discretionary aspects of the sentence imposed, an appellant must present a substantial question as to the inappropriateness of the sentence. "An appellant must, pursuant to Pennsylvania Rule of Appellate Procedure 2119(f), articulate 'the manner in which the sentence violates either a specific provision of the sentencing scheme set forth in the Sentencing Code or a particular fundamental norm underlying the sentencing process.'"

*Commonwealth v. Shugars*, 895 A.2d 1270, 1274 (Pa.Super.2006) (quotation omitted).

¶ 25 Here, Hitner included a 2119(f) statement in his brief, and he has set forth a substantial question. *See Shugars, supra; Commonwealth v. Trimble*, 419 Pa.Super. 108, 615 A.2d 48 (1992). However, we find no merit to Hitner's sentencing challenges and rely on the well-reasoned opinion of the Honorable Alan M. Rubenstein in disposing of Hitner's claims. Trial Court Opinion filed 2/24/06 at 30–36.

 ¶ 26 Finally, Hitner contends the jury's verdict was against the weight of the evidence. Specifically, he alleges the victims' testimony was so riddled with inconsistencies that the verdict was based on pure conjecture, and Hitner's testimony established that the sexual contact between him and the victims was consensual.[17]

For this Court to reverse the jury's verdict on weight of the evidence grounds, we must determine that the verdict is so contrary to the evidence as to "shock one's sense of justice." Our standard of review of a weight of the evidence claim is well-settled.

Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should not be granted in the interest of justice.

*Commonwealth v. Johnson*, 910 A.2d 60, 64 (Pa.Super.2006) (citations and quotations omitted).

¶ 27 We have reviewed the laundry list of inconsistencies Hitner alleges existed in L.H.'s and J.S.'s testimony, and we conclude a new trial is not warranted based thereon. The alleged inconsistencies Hitner points to are minor in light of the overwhelming evidence presented against him. Simply put, we agree the jury's verdict does not "shock one's sense of justice." *Id.*

¶ 28 Moreover, regarding Hitner's claim that the jury should have believed his testimony that the sexual contact between him and the victims was consensual, we find no relief is due. The jury was free to

---

*v. Shugars,* 895 A.2d 1270 (Pa.Super.2006) (holding discretionary aspect of sentencing claim must be raised in lower court in order to be preserved).

**17.** Hitner raised his specific weight of the evidence claims in his post-sentence motion and court-ordered Pa.R.A.P. 1925(b) statement, and therefore, the specific issues have been preserved for appeal. *See* Pa.R.Crim.P. 607(A); *Lord, supra.*

disbelieve Hitner's testimony, and the fact that it did so does not require a new trial on weight of the evidence grounds. *See Commonwealth v. Champney,* 574 Pa. 435, 832 A.2d 403 (2003) (holding that trier of fact is free to believe all, part, or none of the evidence presented).

¶ 29 For all of the foregoing reasons, we affirm.

¶ 30 Affirmed.