J-S12038-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| :--- | :--- | :--- |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JORGE LUIS CARABALLO | : | |
| | : | |
| Appellant | : | No. 1111 MDA 2022 |

Appeal from the Judgment of Sentence Entered July 15, 2022
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s):  CP-22-CR-0006259-2019

BEFORE:   KUNSELMAN, J., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:               **FILED: AUGUST 3, 2023**

Jorge Luis Caraballo appeals from the judgment of sentence imposed following a non-jury trial in which he was convicted of four counts of involuntary deviate sexual intercourse with a child, one count of rape of a child, two counts of unlawful contact with a minor, one count of incest, two counts of indecent assault, two counts of corruption of minors, and one count of criminal use of a communication facility.[1] For these offenses, Caraballo was sentenced to an aggregate forty-eight-to-ninety-six-year term of incarceration. Contemporaneous to this appeal, Caraballo's counsel has filed a petition to withdraw from representation and, additionally, has filed a

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** 18 Pa.C.S. § 3123(b); 18 Pa.C.S. § 3121(c); 18 Pa.C.S. § 6318(a)(1); 18 Pa.C.S. § 4302(b)(1); 18 Pa.C.S. § 3126(a)(7); 18 Pa.C.S. § 6301(a)(1)(ii); 18 Pa.C.S. § 7512, respectively.

corresponding brief pursuant to ***Anders v. California***. ***See*** 386 U.S. 783 (1967). After thoroughly reviewing the record, we affirm Caraballo's judgment of sentence and further grant counsel's petition to withdraw.

As gleaned from the testimony adduced at trial, until October 29, 2019, Caraballo resided with his wife, Amanda Caraballo, his biological son, E.C., born in 2008, and Amanda's biological daughter, J.R., born in 2011. ***See*** N.T., 12/9/21, at 10-11, 33-34, 43, 87 (establishing, further, that in addition to those four, several other people lived at this house). The house featured a "Ring" doorbell, which allowed for Caraballo to view, via a phone application, "what was happening at the front door[.]" ***Id***., at 13. In addition, there were other cameras set up, accessible via other phone applications: "one on the outside of the house right above the [side] door, and then … one on the inside[.]" ***Id***., at 14-16.

At trial, J.R. was the first victim to testify. Beginning when she was in first or second grade, Caraballo "started doing bad things to [her]." ***Id***., at 48. The first incident J.R. could remember involved Caraballo repeatedly kissing her on the cheek when they were on the living room couch. ***See id***., at 49. A second incident, sometime later, featured Caraballo again kissing J.R. on the cheek. ***See id***., at 50-51. This time, however, he also kissed her on the lips and further touched her ribs. ***See id***., at 51. The event took place in J.R.'s bedroom, and Caraballo told her not to tell anybody about what had happened. ***See id***.

J.R. remembered yet another interaction between her and Caraballo

when she was six and one-half years old. *See id*., at 52. On that date and in Caraballo's bedroom, Caraballo started kissing her on the cheek and on her clothing. *See id*., at 52. Eventually, Caraballo took all of her clothing off. *See id*., at 53. Then, "he started doing really bad stuff to [her]." *Id*. Specifically, after he unzipped his jeans, J.R. saw Caraballo's genitals. *See id*. After that, Caraballo's penis "touch[ed]" J.R.'s vagina. *See id*., at 54. J.R. conveyed that Caraballo stuck his penis inside of her while she was laying on her back. *See id*., at 54-55. Caraballo was wearing a condom at the time. *See id*., at 55. J.R. also indicated that "white clear stuff" came out of Caraballo's penis. *See id*., at 56. Like the prior incident, Caraballo told J.R. not to tell anybody. *See id*.

On a different occasion in yet another room of the house, Caraballo touched J.R.'s breasts over her shirt. *See id*., at 57. J.R. testified that Caraballo's penis was pressed against J.R. *See id*. At some point, Caraballo's penis went inside of her anus.[2] *See id*., at 58. Caraballo used a condom, and "white stuff" came out of his penis. *Id*., at 59.

Broadly, J.R. recounted that Caraballo's penis went into her vagina "[a] lot." *Id*., at 60. Caraballo did not use a condom every time. *See id*., at 61. J.R. also stated that Caraballo stuck his penis into her anus "[a] couple times."

---

[2] The nomenclature used by both J.R. and E.C. throughout their testimony in reference to this anatomical portion of their bodies is "butt"; however, their testimonial use of prepositions such as "into" fairly suggests a more specific meaning, i.e., anus, which we have utilized for purposes of clarity and precision.

*Id*. Most of the time, "white stuff" would come out of his penis. *Id*., at 62. Additionally, Caraballo stuck his penis into J.R.'s mouth a couple of times. *See id*. J.R. tasted the substance that came out of Caraballo's penis, indicating that either Caraballo's ejaculate or his penis tasted "[s]our." *Id*., at 63.

To perpetrate these acts, Caraballo would find times when the rest of the household was at school or work. *See id*., at 64. Caraballo would close and lock the door of whatever room he and J.R. were in, and if someone came home, Caraballo would tell J.R. "to get dressed fast and get out." *Id*. Caraballo would look at the cameras that were set up around the house to determine if anyone else was present at the house when the assaults occurred. *See id*. J.R. first told somebody about what Caraballo had been doing to her when she was eight and one-half years old. *See id*.

E.C. was the second victim to take the stand. E.C. first started experiencing "bad things" at the hands of Caraballo when he was nine years old. *Id*., at 90. E.C. recalled a time when Caraballo came up behind him, dropped the towel he had been wearing, and then, completely nude, said to E.C., "this is what a grown man looks like." *Id*., at 90-91. After that, Caraballo "came close to [him], … made [him] get on [his] knees, and then he made [him] suck [Caraballo's] private part" with his mouth. *Id*., at 91. Caraballo then proceeded to stick his penis in E.C.'s anus. *See id*., at 92. Caraballo "told [E.C.] it was a normal father and son thing." *Id*., at 93. Caraballo instructed E.C. not to tell anybody what had happened. *See id*., at 94.

E.C. then recalled Caraballo sticking his penis into E.C.'s anus when

Caraballo was suspended from work. *See id*., at 94. Caraballo "made [E.C.] suck his private part." *Id*., at 95. E.C. also described Caraballo's use of cameras around the house. Caraballo would "turn on the cameras to make sure no one was coming[.]" *Id*., at 97.

E.C. would go on to describe a multitude of situations where Caraballo would force him to engage in oral and anal sex. *See, e.g.*, *id*., at 98. Caraballo asked E.C. if he was "scared to hold [Caraballo's] private part." *Id*., at 97. When E.C. failed to clean his room one time, Caraballo "took [him] in [his] room and [Caraballo] bent [him] over [his] bed and he put his private part in [E.C.'s anus]." *Id*., at 98-99.

E.C. also recalled an incident where he had a milkshake. *See id*., at 100. Caraballo "called [him] in his room and then he told [him] to suck his private part, but before [E.C.] did" he was instructed to "drink some" of that milkshake. *Id*. Although E.C. told Caraballo that the milkshake tasted weird, eventually throwing it away, Caraballo "still made [him] suck his private part." *Id*., at 101.

E.C. then discussed a time where he physically got on top of Caraballo. That day, Caraballo first told him "to suck his private part." *Id*., at 102. However, thereafter, Caraballo's private part went into his anus. *See id*. E.C. stated that it felt different when he was on top of Caraballo, hurting more. *See id*.

Caraballo got into a bathtub with E.C. the one time, making E.C. suck his private part on that occasion, too. *See id*., at 104. Caraballo then "put his

private part in [E.C.'s anus]." ***Id***., at 105. On a camping trip, which involved the two of them sharing a tent, Caraballo "bent [E.C.] over and then put his private part in [his anus]." ***Id***., at 106.

Caraballo would, at times, require E.C. to wear a wrestling outfit. When E.C. wore this clothing, Caraballo stuck "his private part in [E.C.'s anus]." ***Id***., at 110. Caraballo also "put his private part in [E.C.'s] mouth." ***Id***., at 111. Caraballo would wear pajamas with a hole in them. ***See id***. Caraballo "would pull his private part out of the hole and … put it in [E.C.'s anus]." ***Id***., at 112.

Caraballo also had a propensity to utilize sex toys in his engagements with E.C., sticking them up E.C.'s anus. ***See id***., at 115. Finally, E.C. specified that, throughout many of these assaults, Caraballo would "kiss or lick" his face. ***Id***., at 117.

The matter proceeded to a two-day bench trial, which involved, *inter alia*, hearing the testimony of five of the Commonwealth's witnesses, including J.R. and E.C. Caraballo was ultimately found guilty of the aforementioned crimes and, just prior to sentencing, was adjudicated a sexually violent predator ("SVP").

Thereafter, Caraballo filed a timely notice of appeal. As previously mentioned, Caraballo's counsel has filed an ***Anders*** brief before this Court and, too, has petitioned to withdraw from representation. In that brief, counsel presents four discrete bases in which Caraballo could appeal, but ultimately concludes that each is frivolous. We note that Caraballo has not provided any

*pro se* response to counsel's filing, and there is no indication that any independent counsel has filed a brief on Caraballo's behalf.

Prior to our substantive consideration of the issues contained in counsel's **Anders** brief, we must consider whether counsel has adequately adhered to the rigid dictates governing such a withdrawal request. **See Commonwealth v. Garang**, 9 A.3d 237, 240 (Pa. Super. 2010). Specifically, an **Anders** brief evidences counsel's belief that the corresponding appeal is frivolous. Inherent in that belief is counsel's desire to withdraw from representation, which, based on our well-settled case law, requires counsel to:

> (1) petition the [C]ourt for leave to withdraw stating that after making a conscientious examination of the record, counsel has determined the appeal would be frivolous; (2) file a brief referring to any issues that might arguably support the appeal, but which does not resemble a no-merit letter; and (3) furnish a copy of the brief to the defendant and advise him of his right to retain new counsel, proceed *pro se*, or raise any additional points [counsel] deems worthy of this Court's attention.

**Commonwealth v. Edwards**, 906 A.2d 1225, 1227 (Pa. Super. 2006) (citation omitted). In **Commonwealth v. Santiago**, our Supreme Court expounded upon the necessary components of an **Anders** brief, directing counsel, in that brief, to:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

978 A.2d 349, 361 (Pa. 2009). If there is substantial compliance with these **Anders** precepts, then this Court must "conduct a simple review of the record to ascertain if there appear on its face to be arguably meritorious issues that counsel, intentionally or not, missed or misstated." **Commonwealth v. Dempster**, 187 A.3d 266, 272 (Pa. Super. 2018) (*en banc*).

We conclude that counsel has satisfactorily complied with **Anders**. First, counsel's petition indicates that there has been "a conscientious examination of the record[,]" which led to counsel's conclusion "that a direct appeal would be frivolous." Motion to Withdraw as Counsel, ¶ 3. Second, counsel's brief, which is fifty-eight pages in length, replete with an extensive fact and procedural history section, and bolstered by a well-detailed overview of the issues that counsel has identified as frivolous, unquestionably conforms to the four requirements, established in **Santiago**, *supra*. Third, appended to the **Anders** brief is a copy of a letter from counsel, sent to Caraballo, demonstrating counsel's clear intention to withdraw from representation and apprising Caraballo of his right to either seek new counsel or proceed *pro se* to file additional claims. **See Anders** Brief, Ex. C. Accordingly, as the requirements illuminated in **Anders** and its progeny have been met, we consider the "frivolous" claims that counsel has brought forth on Caraballo's

behalf. Thereafter, we conduct an independent review of the record to ascertain whether, in fact, the present appeal is wholly unmeritorious.

The **Anders** brief delves into four issues: (1) the sufficiency of evidence at each conviction; (2) the weight of evidence at each conviction; (3) the legality and discretionary aspects of Caraballo's sentence; and (4) the sufficiency of evidence utilized by the court when it adjudicated Caraballo an SVP. **See id**., at 23. We address these claims in turn.

First, as to sufficiency of the evidence, our standard of review is as follows:

> The standard we apply in reviewing the sufficiency of evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact[-]finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth may not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

**Commonwealth v. Lambert**, 795 A.2d 1010, 1014–15 (Pa. Super. 2002) (citations omitted).

The **Anders** brief segregates and discusses Caraballo's convictions as

to those that involved J.R. and those that involved E.C. Through our intensive review of the notes of testimony and when juxtaposed against the relevant statutory and decisional case law at each convicted offense, we conclude that there was sufficient evidence to find Caraballo guilty. Specifically, the record is replete with testimonial evidence establishing Caraballo's guilt as to, *inter alia*, involuntary deviate sexual intercourse, rape, and, because E.C. is Caraballo's biological son, incest. Therefore, any challenge to the sufficiency of evidence in this case would be wholly frivolous.

Simultaneous with his sufficiency section, Caraballo discusses the validity of presenting a challenge to weight of the evidence at each of his offenses. A weight-of-evidence challenge must be preserved either in a post-sentence motion, a written motion before sentencing, or orally prior to sentencing. **See** Pa.R.Crim.P. 607(A)(1)-(3); **see also id**., cmt. (establishing that "[t]he purpose of this rule is to make it clear that a challenge to the weight of the evidence must be raised with the trial judge or it will be waived"). If a weight challenge is not presented to the trial court through one of the aforementioned methods, it is waived. **See Commonwealth v. Burkett**, 830 A.2d 1034, 1037 (Pa. Super. 2003). Caraballo did not file a post-sentence motion, and through our own review of the record, we have not uncovered any indication that such a claim has been adequately preserved. Accordingly, any weight challenge would be frivolous since it was not properly preserved at the lower court level. **See Commonwealth v. Cox**, 231 A.3d 1011, 1016

(Pa. Super. 2020) (finding that this Court may not address issues that were not properly preserved in the trial court).

On potential issues associated with Caraballo's sentencing, the *Anders* brief first alludes to whether any of his convictions would merge for sentencing purposes. *See* 42 Pa.C.S. § 9765 (prohibiting the merger of crimes at sentencing "unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense"). At sentencing, the court considered the question of merger and ultimately found it to be inapplicable given the number of discrete incidents of sexual assault that J.R. and E.C. delved into when contrasted with the elements of his convictions. *See* Sentencing Hearing, 7/15/22, at 39-41, 43. The *Anders* brief concludes that such a determination was appropriate as the statutory elements varied or featured different additional elements predicated on the victims' testimonies, and after our own review of the statutory elements of each of his convictions, we see no basis to contradict the lower court's determination. As such, any challenge would be frivolous.

Continuing in the domain of sentencing, the *Anders* brief delves into whether Caraballo could proffer a nonfrivolous claim as to the discretionary aspects of his sentence. The *Anders* brief concedes that "there was no preservation of a sentencing claim at sentencing or in a post-sentence motion." *Anders* Brief, at 49. Resultantly, "any challenge to the discretionary aspects of sentencing has been waived." *Id*.

We employ the following standard of review for discretionary aspects of sentencing claims:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

The right to appellate review of the discretionary aspects of a sentence is not absolute, and must be considered a petition for permission to appeal. An appellant must satisfy a four-part test to invoke this Court's jurisdiction when challenging the discretionary aspects of a sentence.

[W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether appellant's brief has a fatal defect[, **see** Pa.R.A.P. 2119(f)]; and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

**Commonwealth v. Zirkle**, 107 A.3d 127, 132 (Pa. Super. 2014) (citations omitted).

We have reviewed the record and have failed to find any place at which Caraballo preserved this issue for appellate review. Stated differently, Caraballo did not challenge the discretionary aspects of his sentence via post-sentence motion or concomitant with the lower court's imposition of his sentence. Because we have held that the failure to properly preserve the issue at the lower court level prevents this Court from having jurisdiction to review

such a claim, his discretionary sentencing challenge is necessarily waived.

Through waiver, any claim pursuing the same would have been frivolous given

our lack of ability to review such a contention on appeal.[3]

Finally, the **Anders** brief presents the question of whether a challenge

to Caraballo's SVP determination would be frivolous. Our standard of review

in this domain is as follows:

> The determination of a defendant's SVP status may only be made following an assessment by the [Sexual Offenders Assessment Board ("SOAB")] and hearing before the trial court. In order to affirm an SVP designation, we, as a reviewing court, must be able to conclude that the fact-finder found clear and convincing evidence that the individual is a sexually violent predator. As with any sufficiency of the evidence claim, we view all the evidence and reasonable inferences therefrom in the light most favorable to the Commonwealth. We will reverse a trial court's determination of SVP status only if the Commonwealth has not presented clear and convincing evidence that each element of the statute has been satisfied.
>
> The standard of proof governing the determination of SVP status, i.e., "clear and convincing evidence," has been described as an "intermediate" test, which is more exacting than a preponderance of the evidence test, but less exacting than proof beyond a reasonable doubt.
>
> * * *
>
> The clear and convincing standard requires evidence that is "so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth

---

[3] We note that the **Anders** brief also discusses Caraballo's incarceration term, amounting to forty-eight to ninety-six years, and remarks that "if the [c]ourt imposed guideline sentences and imposed them consecutively, [it] could have imposed a minimum sentence of … 130 years." **Anders** Brief, at 52. Instead, "[t]he sentencing court's imposition of [forty-eight] years minimum is an extreme downward departure." **Id**.

of the precise facts [in] issue."

***Commonwealth v. Fuentes***, 991 A.2d 935, 941–42 (Pa. Super. 2010) (*en banc*) (citations omitted).

The ***Anders*** brief frames the SVP issue in the context of whether Caraballo "possessed a mental abnormality which causes a likelihood to reoffend." ***Anders*** Brief, at 54; ***see also*** 42 Pa.C.S. § 9799.12 (defining sexually violent predator as one who, in addition to being convicted at a specifically enumerated offense, possesses "a mental abnormality or personality disorder that makes the individual likely to engage in predatory sexually violent offenses[]").

Our review of the SVP hearing transcript confirms that any challenge to his SVP adjudication would be frivolous. At the hearing, Dr. Robert Stein communicated that he had diagnosed Caraballo with pedophilic disorder, other specified paraphilic disorder (specifically involving incest, non-consent, and fetish), and antisocial personality disorder. ***See*** SVP Hearing, 7/15/22, at 17-18. Additionally, Dr. Stein's testimony, predicated on his analysis of both the facts underpinning both Caraballo and the criminal acts that he committed, giving specific attention to the fifteen assessment-related factors outlined at 42 Pa.C.S. § 9799.24, established within a reasonable degree of scientific certainty that Caraballo was likely to reoffend. ***See, e.g***., ***id***., at 19-20 ("I think when you look at the course of conduct with both children, you would

not want the defendant to be in the company of children unsupervised for the rest of his life.").

Notwithstanding the fact that Caraballo was permitted to raise this issue, for the first time, before this Court, *see Commonwealth v. Hitner*, 910 A.2d 721, 728 n.8 (Pa. Super. 2006) (identifying that SVP sufficiency claims may be raised "for the first time on appeal") (citation omitted), we agree that any challenge to Caraballo's SVP determination, viewed in a light most favorable to the Commonwealth, would have been frivolous as the voluminous evidence presented to the lower court as to Caraballo's sexually violent nature was unquestionably clear and convincing. *See, e.g.*, SVP Hearing, 7/15/22, at 11-21.

In accordance with *Anders*, we have independently reviewed the record to ascertain the existence of other non-frivolous issues. Our review has uncovered nothing legally viable for Caraballo to have pursued on appeal.

Therefore, as we are unable to find any non-frivolous issues and further see no merit to the potential issues illuminated in counsel's *Anders* brief, we grant the petition to withdraw and affirm Caraballo's judgment of sentence.

Petition to withdraw from representation granted. Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 08/03/2023