**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Barmi FUENTES, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 10, 2009.

Filed March 17, 2010.

Lori Mach, Public Defender, for appellant.

Mary Huber, Assistant District Attorney, for Commonwealth, appellee.

BEFORE: FORD ELLIOTT, P.J., STEVENS, MUSMANNO, BENDER, BOWES, GANTMAN, DONOHUE, SHOGAN, & ALLEN, JJ.

OPINION BY STEVENS, J.:

¶ 1 This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County following Appellant's negotiated guilty plea to the charges of aggravated indecent assault, 18 Pa.C.S.A. § 3125, and three counts of robbery, 18 Pa.C.S.A. § 3701(a)(1). On appeal, Appellant seeks review of the trial court's determination that he is a sexually violent predator (SVP) under Megan's Law.[1] Specifically, Appellant contends the trial court erred in determining the Commonwealth proved by clear and convincing evidence that: (1) Appellant suffered from an antisocial personality disorder and (2) Appellant was "likely" to engage in future predatory sexual violence. We affirm.

¶ 2 The relevant facts and procedural history are as follows: On March 9, 2006, at approximately 8:00 p.m., Appellant, who was twenty-four years old, approached the sixteen-year-old victim, her sixteen-year-old sister, and her sister's nineteen-year-old boyfriend in a threatening manner in the area of the 4100 block of M Street in Philadelphia. N.T. 5/30/07 at 12–13. All of the victims believed Appellant "might have a gun." N.T. 5/30/07 at 13. Appellant took the sister's boyfriend's jacket, wallet, and day planner, and he removed from the sister's pocket one dollar. N.T. 5/30/07 at 13. Appellant took the victim into an alley, which was right next to the sidewalk. N.T. 5/30/07 at 13. Appellant kissed the victim, fondled her vaginal area, exposed his penis, and forced her to touch it. N.T. 2/29/08 at 13. Appellant then pulled down the victim's pants, inserted his finger into her vagina without her permission, and threatened to kill her if she reported the sexual assault. N.T. 5/30/07 at 13; N.T. 2/29/08 at 13. Appellant took the victim's earrings and left the scene.

---

1.  42 Pa.C.S.A. §§ 9791–9799.9. "[T]he General Assembly amended Megan's Law II in 2004, with an effective date of January 24, 2005 (known as "Megan's Law III")." *Commonwealth v. Hitner*, 910 A.2d 721, 723 n. 6 (Pa.Super.2006), *appeal denied*, 592 Pa. 772, 926 A.2d 441 (2007) (quotation omitted). We conclude Appellant is subject to the newly-amended Megan's Law III. *See Hitner, supra* (*quoting Commonwealth v. Benner*, 853 A.2d 1068 (Pa.Super.2004) (holding that most current version of Megan's Law is applicable so long as the defendant remains in the custody of correctional authorities to discharge any part of his sentence for the sex offense)).

N.T. 5/30/07 at 13. Police subsequently recovered the sister's boyfriend's jacket, which contained the victim's earrings, and arrested Appellant.

¶ 3 On May 30, 2007, Appellant, who was represented by counsel, entered a negotiated guilty plea to the charges indicated *supra,* and on February 29, 2008, he proceeded to a Megan's Law hearing and sentencing. During the hearing, the parties stipulated to the qualifications of Barbara Ellen Ziv, M.D., a member of the Sexual Offenders Assessment Board (the Board) who conducted the assessment in this case. N.T. 2/29/08 at 5–6.

¶ 4 On direct-examination, Dr. Ziv testified that she reviewed Appellant's records, which were provided to the Board, and she completed a report on July 23, 2007. N.T. 2/29/08 at 8. Dr. Ziv noted that Appellant declined to be interviewed and the materials in this case consisted largely of police records. N.T. 2/29/08 at 12.

¶ 5 Dr. Ziv testified that Appellant has a mental abnormality or personality disorder, which makes it likely that he will engage in predatory behavior. Specifically, Dr. Ziv testified as follows:

[Appellant] met the criteria of both of these arms of the statute. In terms of predatory behavior, he pled guilty to aggravated assault—aggravated indecent assault. He had no previous relationship with the victim, and clearly that meets the criteria for predatory behavior in that he initiated this relationship for the purpose of sexual victimization.

In addition, [Appellant] meets the criteria for antisocial personality disorder. The criteria for antisocial personality disorder as defined by the DSM–IV are as follows. [A], pervasive pattern of disregard for and violation of the rights of others occurring since the age 15 years, as indicated by three or more of the following.

One, failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest. [Appellant's] criminal arrest history began when he was 12 years old and has continued into adulthood.

Two, deceitfulness, as indicated by repeated lying, use of aliases or conning others for personal profit or pleasure. [Appellant] has a history of using aliases. He has used Jose Gonzalez and Barry Gonzalez in the past when he was arrested.

[Three,] [i]mpulsivity or failure to plan ahead. [Appellant's] life has been characterized by impulsivity with respect to his unlawful behaviors.

Four, irritability and aggressiveness, as indicated by repeated physical fights or assaults. I do not have information about this particular symptom.

Reckless disregard for safety of others. [Appellant's] conviction for aggravated indecent assault indicates such disregard.

Consistent irresponsibility as indicated by repeated failure to sustain consistent work behavior or honor financial obligations. Although his complete work employment is not known, he was reportedly employed at the Washington Distribution Center at the time of his arrest.

Lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated or stolen from another. I don't have any information about this.

[B], the individual is at least 18 years old. [Appellant] was 24 years old at the time of the indecent assault of [the victim].

There's evidence of conduct disorder before age 15. [Appellant] was adjudicated delinquent at age 12.

The occurrence of antisocial behavior is not exclusively during the course of schizophrenia or manic episode and there is no evidence that [Appellant] was acutely psychotic or manic at the time of this assault.

N.T. 2/29/08 at 9–11.

¶ 6 Dr. Ziv opined, to a reasonable degree of psychiatric certainty, that Appellant is a SVP for Megan's Law purposes. N.T. 2/29/08 at 11. Dr. Ziv noted that the nature of the instant crime was predatory. N.T. 2/29/08 at 13. She revealed that Appellant has three arrests as a juvenile, including at ages twelve, sixteen, and seventeen. N.T. 2/29/08 at 14. The charges included robbery, theft, receiving stolen property, simple assault, reckless endangerment, criminal conspiracy, and unauthorized use of an automobile. N.T. 2/29/08 at 14. As a juvenile, Appellant failed to appear in court on one occasion and he violated his probation on another occasion. N.T. 2/29/08 at 14. Despite being committed to a juvenile facility, Appellant was arrested three times as an adult prior to the crimes at issue. N.T. 2/29/08 at 15. Specifically, at age nineteen, Appellant pled guilty to possession with the intent to deliver a controlled substance, and he violated his probation three times with regard thereto. N.T. 2/29/08 at 30. At age twenty, Appellant was arrested for robbery; however, the victim failed to appear and the case was discharged. N.T. 2/29/08 at 31. Also, at age twenty, Appellant was arrested in connection with a stolen automobile; however, the Commonwealth declined to prosecute. N.T. 2/29/08 at 31.

¶ 7 Dr. Ziv explained that Appellant's criminal history is indicative of his personality disorder. N.T. 2/29/08 at 15. Specifically,

[H]e has a wide variety of criminal acts. His acts began when he was 12. He was adjudicated delinquent. That has been persistent in that it has continued beyond into adulthood despite the fact that he was put in a juvenile facility, one that is presume[ably] designed to address those behaviors, and that he continues to act in a criminal manner after he reached adulthood is indicative of an antisocial personality disorder.

N.T. 2/29/08 at 15.

¶ 8 With regard to predatory behavior, Dr. Ziv noted that "[Appellant] was unacquainted with the victim and he forced her into an alley and then sexually assaulted her. That's the definition of predatory behavior." N.T. 2/29/08 at 15.

¶ 9 With regard to the factors to be examined under Megan's Law, Dr. Ziv testified:

The statute asks that you address certain factors. There is one victim in this case. He sexually assaulted a stranger. Multiple assaults are associated with a higher risk of recidivism. He exceeded the means necessary to achieve the offense by threatening the victim, she thought, with a gun and threatening to kill her.

The nature of the sexual contact involves intention, deliberate, involved and persistent risk taking. He was unrelated to the victim and [she] was a stranger to him. The victim was 16 years old at the time of the assault. He displayed unusual cruelty toward her by threatening her with death.

At the time that I did this, the mental capacity of the victim was not specifically known but I have since learned that she had mild mental retardation. He has no known prior offense history.

N.T. 2/29/08 at 16.

¶ 10 With regard to Appellant's risk to reoffend, Dr. Ziv indicated:

The two most robust factors in all the literature associated with recidivism risk are antisocial traits and deviant sexual interest. Obviously, raping somebody or sexually assaulting somebody, a stranger, is deviant sexual interest and he has, as I have talked about, a repeated pattern of antisocial behavior. In addition, the fact that it's a stranger victim and that he was less than 25 years old are also associated with recidivism risks.

N.T. 2/29/08 at 16–17.

¶ 11 Dr. Ziv testified that all of her opinions were based on a reasonable degree of medical certainty. N.T. 2/29/08 at 17.

¶ 12 On cross-examination, Dr. Ziv reiterated that Appellant has a personality disorder which makes it likely that Appellant will reoffend. N.T. 2/29/08 at 20. Specifically, Dr. Ziv opined that Appellant meets the Diagnostic and Statistical Manual's definition of an individual who has an antisocial personality disorder. N.T. 2/29/08 at 22–23. An essential feature of antisocial personality disorder is "a pervasive pattern of disregard for and violation of the rights of others that begins in childhood or early adolescence and continues into adulthood[.]" N.T. 2/29/08 at 25. Dr. Ziv admitted that she made Appellant's diagnosis solely based on his arrest record, N.T. 2/29/08 at 27, and in this vein testified as follows:

[O]ften that is not enough to make that determination. In this case, he passed a threshold. I suspect that if I had additional information, I could make it with greater elaboration. Very often when people don't participate—and the fact that I do get limited records, about a third of the people I evaluate meet [the] criteria for SVP. That meets [sic] two-thirds don't. Very often those two-thirds don't because I don't have enough information. In the case of [Appellant], it's [sic] he has enough information just by in his arrest record only to meet that threshold.

N.T. 2/29/08 at 27–28.

¶ 13 Defense counsel asked Dr. Ziv how Appellant's arrest record differs from thousands of other young men growing up in Philadelphia, who commit many crimes, such as robbery, "a couple of car cases," and a drug case, and was there "something magical about [Appellant's] set of facts that would make you jump to the conclusion that this person suffers from antisocial personality disorder?" N.T. 2/29/08 at 32–33. Dr. Ziv replied:

First of all, I'm not jumping to the conclusion. I'm using the DSM–IV as the scaffolding in order to make this determination. Second of all, what makes [Appellant] different from the other guys that I have evaluated, even people who have stranger sexual assaults, is that it began at 12–and it doesn't really matter what he did at 12. Obviously, if he had been truant from school, that's a different thing. But it's at 12, it's at 16 and then he continues to persist in his behaviors while he's in—you know, he's got three violations of probation.

It's at 16, 17, 19, 20 and it's an escalation. His unauthorized use of an auto and robbery, which are occurring earlier, have now progressed to rape or sexual assault and use of gun and threats of death. Those are all—that's all the information that is consistent with my ability to render this determination.

N.T. 2/29/08 at 33.

¶ 14 Dr. Ziv opined that "[t]here are certain areas where clinicians can disagree[;] however, I don't think that this is one of them." N.T. 2/29/08 at 34. Defense counsel then questioned Dr. Ziv

about an article, which was written by Professor Levinson and discussed the reliability that a certain outcome will result.[2] N.T. 2/29/08 at 36. Dr. Ziv noted that the article does not address antisocial personality disorder, and in her opinion, the article is an "incredibly flawed paper." N.T. 2/29/08 at 37. She further noted that the diagnosis of antisocial personality disorder has a "higher inter-rater reliability than other personality disorders." N.T. 2/29/08 at 38.

¶ 15 With regard to Appellant's antisocial personality diagnosis, Dr. Ziv admitted that Appellant's work history was largely unknown. N.T. 2/29/08 at 39. Dr. Ziv noted that Appellant used two aliases, including Barry Gonzalez and Jose Gonzalez. N.T. 2/29/08 at 40. Defense counsel asked Dr. Ziv whether she knew "Gonzalez" is Appellant's mother's maiden name and people in the Hispanic community often use their mother's maiden name as part of their last name. N.T. 2/29/08 at 40. Dr. Ziv noted that Appellant was using the first names of "Barry" and "Jose," even though his first name is "Barmi." N.T. 2/29/08 at 40–41. As to the evidence of a conduct disorder with onset before age fifteen, Dr. Ziv testified that this criteria was met because Appellant was adjudicated delinquent at age twelve. N.T. 2/29/08 at 41–42. Dr. Ziv opined it was likely Appellant would reoffend, and she indicated this opinion was based on Appellant's antisocial personality, the fact the victim was a stranger, his deviant sexual interest, his age, and his behavior has escalated. N.T. 2/29/08 at 42. Dr. Ziv indicated she used actuarial points to render her conclusion that it is likely Appellant will reoffend. N.T. 2/29/08 at 44. She indicated that, in determining the likelihood a person will reoffend, "[t]he two strongest [factors] are deviant sexual interest and antisocial traits.... [P]eople who have done it once and do it again also are at high risk." N.T. 2/29/08 at 45.

¶ 16 Dr. Ziv noted that she could not make a diagnosis as to whether Appellant has paraphilia because she was not provided with relevant information for the six month time period. N.T. 2/29/08 at 24–25. Moreover, while Dr. Ziv admitted that the instant arrest was Appellant's first arrest for a sexual offense, Dr. Ziv opined that "it is highly unlikely, from a clinical point of view, [the instant offense was] an isolated instance ... I can tell you as a clinician that it is unlikely that [Appellant], this is the first and only time that he's acted in a deviant sexual way, but what I can tell you is this is the first time and only time he's been arrested for it." N.T. 2/29/08 at 25–26.

¶ 17 On re-direct examination, the following relevant exchange occurred between the prosecutor and Dr. Ziv:

Q: The mental abnormality that the statute requires, it requires any mental abnormality not just a sex-related one, correct?

A: It requires a mental abnormality that renders somebody likely to reoffend. As I have said repeatedly, antisocial traits [are] number one in terms of recidivism risk.

Q: You're able to meet that threshold with just the arrest record alone, correct?

A: Correct.

Q: Would it make a different if you had the specific facts of each of those arrests?

2. Upon the prosecutor's objection, defense counsel admitted that the questioning would not go to the admissibility of Dr. Ziv's opinion; but rather, would go to the weight of her opinions. N.T. 2/29/08 at 36.

**A:** No, it would probably bolster and flesh out this diagnosis.

**Q:** Correct, because you are aware of the charges he was actually arrested on?

**A:** Right.

**Q:** And you're aware of his probation violations?

**A:** Correct.

**Q:** You also said that two-thirds of your assessments, they don't meet sexually violent predators, so most of the time you're actually saying somebody is not a sexually violent predator?

**A:** I'm saying that they don't meet the criteria for a sexually violent predator.

**Q:** Under the statute?

**A:** Yes.

N.T. 2/29/08 at 46–47 (bold in original).

¶ 18 At the conclusion of Dr. Ziv's testimony, the trial court found, by clear and convincing evidence, that Appellant is a SVP for Megan's Law purposes. N.T. 2/29/08 at 63–64. The trial court sentenced Appellant to an aggregate of 29 months to 102 months in prison, to be followed by four years of probation. N.T. 2/29/08 at 73. Appellant did not file post-sentence motions; however, this timely appeal followed. On March 26, 2008, the trial court ordered Appellant to file a Pa. R.A.P. 1925(b) statement, and on April 15, 2008, Appellant filed a statement contending the evidence was insufficient to sustain the trial court's SVP determination.[3] The trial court filed a responsive Pa.R.A.P. 1925(a) opinion.

¶ 19 On July 31, 2009, the majority of a three-judge panel of this Court filed an Opinion reversing the trial court's SVP determination and discharging all requirements attendant to it. In all other respects, the majority affirmed Appellant's judgment of sentence. However, on August 13, 2009, the Commonwealth filed a motion for reconsideration/reargument, which this Court granted on September 30, 2009, resulting in the withdrawal of the three-judge panel Opinion.

¶ 20 Appellant presents the following question for our review:

Did not the Commonwealth fail to prove by clear and convincing evidence that appellant met the statutory definition of a "sexually violent predator" (SVP) where[:] a) the Commonwealth failed to prove by clear and convincing evidence that appellant suffered from Antisocial Personality Disorder (ASPD), and b) the Commonwealth failed to prove by clear and convincing evidence that appellant was "likely" to engage in future predatory sexual violence, where the instant offense was his only arrest for a sexual crime?

Brief for Appellant at 3.[4]

■ ¶ 21 In support of his question presented, Appellant argues that the evidence adduced in support of his SVP designation failed to satisfy either of the required statutory prongs and, therefore, the evidence was not legally sufficient to prove that he is an SVP.

The determination of a defendant's SVP status may only be made following

---

**3.** Appellant filed a petition for an extension of time in which to file a supplemental Pa.R.A.P. 1925(b) statement; however, the trial court denied the petition.

**4.** We note that Appellant has preserved his sufficiency of the evidence claim. *See* Pa. R.A.P. 1925(b); *Hitner, supra* (indicating Pa.

R.Crim.P. 606 sets forth the manner in which a challenge to the sufficiency of the evidence supporting a SVP determination must be made); Pa.R.Crim.P. 606(A)(7) ("[A] challenge to the sufficiency of the evidence [may be] made on appeal.").

an assessment by the Board and hearing before the trial court. In order to affirm an SVP designation, we, as a reviewing court, must be able to conclude that the fact-finder found clear and convincing evidence that the individual is a sexually violent predator. As with any sufficiency of the evidence claim, we view all evidence and reasonable inferences therefrom in the light most favorable to the Commonwealth. We will reverse a trial court's determination of SVP status only if the Commonwealth has not presented clear and convincing evidence that each element of the statute has been satisfied.

*Commonwealth v. Geiter*, 929 A.2d 648, 650 (Pa.Super.2007), *appeal denied*, 596 Pa. 703, 940 A.2d 362 (2007) (quotations, quotation marks, citations and footnotes omitted).

The standard of proof governing the determination of SVP status, i.e., "clear and convincing evidence," has been described as an "intermediate" test, which is more exacting than a preponderance of the evidence test, but less exacting than proof beyond a reasonable doubt.

\*      \*      \*

The clear and convincing standard requires evidence that is "so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts [in] issue."

*Commonwealth v. Meals*, 590 Pa. 110, 120–21, 912 A.2d 213, 219 (2006) (quotation omitted).

¶ 22 Pennsylvania's version of Megan's Law defines an SVP as:

A person who has been convicted of a sexually violent offense as set forth in section 9795.1 (relating to registration)[5] and who is determined to be a sexually

violent predator under section 9795.4 (relating to assessments) due to a mental abnormality or personality disorder that makes the person likely to engage in predatory sexually violent offenses.

42 Pa.C.S.A. § 9792 (footnote added).

The process of determining SVP status is statutorily-mandated and well-defined. The triggering event is a conviction for one or more offenses specified in 42 Pa.C.S.A. § 9795.1, which, in turn, prompts the trial court to order an SVP assessment by the SOAB. The Board's administrative officer then assigns the matter to one of the Board's members, all of whom are "experts in the field of the behavior and treatment of sexual offenders." 42 Pa.C.S.A. § 9799.3. At the core of the expert's assessment is a detailed list of factors, which are mandatory and are designed as "criteria by which . . . [the] likelihood [of reoffense] may be gauged." *Commonwealth v. Bey*, 841 A.2d 562, 566 (Pa.Super.2004).

*Commonwealth v. Dixon*, 907 A.2d 533, 535–36 (Pa.Super.2006), *appeal denied*, 591 Pa. 722, 920 A.2d 830 (2007).

*Geiter*, 929 A.2d at 650.

¶ 23 The statute specifies that the assessment must include, but is not limited to, an examination of the following factors:

(1) Facts of the current offense, including:

(i) Whether the offense involved multiple victims,

(ii) Whether the individual exceeded the means necessary to achieve the offense,

(iii) The nature of the sexual contact with the victim,

(iv) Relationship of the individual to the victim,

5. Appellant was convicted of a sexually vio-      lent offense.

(v) Age of the victim,

(vi) Whether the offense included a display of unusual cruelty by the individual during the commission of the crime,

(vii) The mental capacity of the victim.

(2) Prior offense history, including:

(i) The individual's prior criminal record,

(ii) Whether the individual completed any prior sentences,

(iii) Whether the individual participated in available programs for sexual offenders.

(3) Characteristics of the individual, including:

(i) Age of the individual,

(ii) Use of illegal drugs by the individual,

(iii) Any mental illness, mental disability or mental abnormality,

(iv) Behavioral characteristics that contribute to the individual's conduct.

(4) Factors that are supported in a sexual offender assessment field as criteria reasonably related to the risk of reoffense.

42 Pa.C.S.A. § 9795.4(b). *See Geiter, supra.*

The precise line of inquiry for the Board's expert, as well as any other expert who testifies at an SVP hearing, is "whether the defendant satisfied the definition of a sexually violent predator set out in the statute, that is, whether he or she suffers from 'a mental abnormality or personality disorder that makes [him or her] likely to engage in predatory sexually violent offenses.' 42 Pa. C.S.A. § 9792." *Dixon,* 907 A.2d at 536. The salient inquiry to be made by the trial court is the identification of the *impetus* behind the commission of the crime and the extent to which the offender is likely to *reoffend. Common-*

*wealth v. Price,* 876 A.2d 988, 995 (Pa.Super.2005), *appeal denied,* 587 Pa. 706, 897 A.2d 1184 (2006), *cert. denied,* 549 U.S. 902, 127 S.Ct. 224, 166 L.Ed.2d 179 (2006).

*Geiter,* 929 A.2d at 650–651 (italics in original).

¶ 24 In this context, a "mental abnormality" is a "congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons." 42 Pa.C.S.A. § 9792. *See Meals, supra.* Moreover, "predatory" conduct, which is indispensable to the designation, is defined as an "act directed at a stranger or at a person with whom a relationship has been initiated, established, maintained or promoted, in whole or in part, in order to facilitate or support victimization." *Meals,* 590 Pa. at 120, 912 A.2d at 218–19 (*quoting* 42 Pa.C.S.A. § 9792).

¶ 25 After a careful review, and viewing the evidence in the light most favorable to the Commonwealth, we conclude the evidence was sufficient to support the trial court's classification of Appellant as an SVP. For example, Dr. Ziv identified antisocial personality disorder as Appellant's "mental abnormality or personality disorder," noting that Appellant, who was at least eighteen years old, has engaged in a pervasive pattern of disregard for and violation of the rights of others since at least the age of fifteen. *See Meals, supra* (discussing analysis to be used in determining sufficiency of the evidence for SVP status). She explained that Appellant's extensive criminal arrest history, which commenced when he was twelve years old, indicated a failure to conform to social norms with respect to lawful behavior; he engaged in

deceitfulness through the use of aliases; his life has been characterized by impulsivity, which has been displayed through his unlawful behaviors; and his conviction for aggravated indecent assault displayed a reckless disregard for the safety of others. She noted that he engaged in persistent risk taking and exceeded the means necessary to achieve the offense in the instant sexual assault. She also indicated that Appellant's behaviors did not result from a schizophrenic or manic episode.

¶ 26 With respect to the question of whether Appellant's abnormality/disorder resulted in a predisposition to commit criminal sexual acts, Dr. Ziv testified that Appellant was likely to reoffend. *See Meals, supra.* She explained that the "two most robust factors" associated with "recidivism risks" are "antisocial traits and deviant sexual interest." N.T. 2/29/08 at 16–17. Dr. Ziv testified about Appellant's repeated pattern of antisocial behavior, which has been exhibited by his three juvenile arrests and four adult arrests, and explained that criminal acts have been persistent in his life. She noted that, despite the fact he was placed in a juvenile facility, which was designed to address Appellant's behaviors, he continued to act out in a criminal manner after he reached adulthood. Dr. Ziv testified about the deviant sexual interest displayed by Appellant, including the fact he sexually assaulted a sixteen-year-old stranger, who was mildly retarded, on the street. She indicated that Appellant's actions have escalated over time, resulting in the most recent sexual assault and threats of death, and people who have antisocial traits are "number one in terms of recidivism risk." N.T. 2/29/09 at 46. Moreover, with respect to "predatory" behavior, Dr. Ziv opined that Appellant displayed predatory behavior. *See Meals, supra.* She stressed that Appellant was unacquainted with the victim, forced her into an alley, and then sexually assaulted her. "That's the definition of predatory behavior." N.T. 2/29/08 at 15.

¶ 27 Finally, Dr. Ziv's opinions were rendered to a reasonable degree of professional certainty. "Because the expert's report and testimony support the trial court's finding that [Appellant] was an SVP, there is no basis for granting sufficiency relief." *Meals,* 590 Pa. at 128, 912 A.2d at 223.

¶ 28 We note that we find unavailing Appellant's arguments that the evidence was insufficient to sustain his SVP status since (1) Dr. Ziv did not personally interview Appellant, (2) her opinions were based solely on Appellant's prior criminal record and police reports, (3) Dr. Ziv had "no information about [his] background, education, economic circumstances, health, work history or home life," Brief for Appellant at 11, (4) Dr. Ziv's opinion that Appellant was likely to reoffend was based solely on her clinical judgment and not on any actuarial instrument to predict risk, and (5) Dr. Ziv admitted that a prior sexual assault is one of the best predictors of future sexual violence; however, Appellant has not been arrested or charged with any previous sexual offenses.

■ ¶ 29 We conclude that Appellant has mischaracterized his arguments as sufficiency of the evidence claims, and in particular, we specifically disagree with his contention that his claims challenge the sufficiency, and not the weight, of the evidence. Appellant's arguments ignore the well-settled law that an expert's opinion, which is rendered to a reasonable degree of professional certainty, is **itself** evidence. *See Meals, supra.* As this Court has held with regard to SVP claims:

> We do not weigh the evidence presented to the sentencing court and do not make credibility determinations.... We keep in mind that a Board report or opinion that the individual has an abnormality

indicating the likelihood of predatory sexual violent offenses is itself evidence. Also, while a defendant is surely entitled to challenge such evidence by contesting its credibility or reliability before the SVP court, such efforts affect the weight, not the sufficiency of the Commonwealth's case. Accordingly, they do not affect our sufficiency analysis.

*Commonwealth v. Feucht,* 955 A.2d 377, 382 (Pa.Super.2008) (citations omitted).

¶ 30 In the case *sub judice,* to the extent Appellant believes that Dr. Ziv's "diagnosis" was not fully explained, did not square with accepted analyses of the disorder, or was simply erroneous, he was free to introduce evidence to that effect and/or to argue to the fact-finder that the Commonwealth's expert's conclusions should be discounted or ignored. *See Meals, supra.* However, such arguments would affect the weight, and not the sufficiency of the expert's evidence.[6] *See id.*

¶ 31 For all of the foregoing reasons, we affirm.

¶ 32 Affirmed.

¶ 33 BENDER, J. files a Dissenting Opinion in which DONOHUE, J. joins.

## DISSENTING OPINION BY BENDER, J.:

¶ 1 I respectfully dissent. In this case, the trial court branded the defendant with the proverbial "mark of Cain," designating him a sexually violent predator based on the opinion of an "expert" whose conclusions often descend to speculation and whose testimony would not pass muster in a civil tort action. Designation of a witness as an expert is not an evidentiary wild card and does not render the wit-

ness's opinions inviolable. Opinions for which the witness cannot articulate *objectively verifiable factual support* are not competent evidence and are not legally sufficient to sustain any determination in a court of law. *See Viener v. Jacobs,* 834 A.2d 546, 558 (Pa.Super.2003) ("While an expert's opinion need not be based on absolute certainty, an opinion based on mere possibilities is not competent evidence."). *See also* Pa.R.E. 703. To the extent the trial court's disposition rests on such opinions, it ignores the Rules of Evidence, conflates guesswork with fact, and imposes a permanent stigma based on insufficient evidence. Fuentes's challenge on this basis is meritorious and, in my opinion, should be granted.

¶ 2 A challenge to the sufficiency of the evidence is a question of law of which our scope of review is plenary and our standard of review, *de novo. See Commonwealth v. Meals,* 590 Pa. 110, 912 A.2d 213, 218 (2006). "In reviewing the sufficiency of the evidence regarding the determination of SVP status, we will reverse the trial court only if the Commonwealth has not presented clear and convincing evidence sufficient to enable the trial court to determine that each element required by the statute has been satisfied." *Commonwealth v. Plucinski,* 868 A.2d 20, 25 (Pa.Super.2005). The reviewing court must view the evidence in the light most favorable to the Commonwealth. *Id.* We may not reweigh the evidence or substitute our judgment for that of the trial court. *Id.* The "clear and convincing" evidence standard requires evidence that is "so clear, direct, weighty and convincing" as to enable the factfinder to reach "a clear conviction, without hesitancy, of the truth

---

**6.** We note that Appellant has not developed a weight of the evidence claim on appeal and, instead, he steadfastly maintains his specific challenges implicate the sufficiency, and not the weight, of the evidence. *See* Brief for Appellant at 17.

of the precise facts" at issue.[1] *Id.* The factfinder is free to believe all, part or none of the evidence presented. *Commonwealth v. Haughwout*, 837 A.2d 480, 484 (Pa.Super.2003).

¶ 3 An SVP is defined as a "person who has been convicted of a sexually violent offense as set forth in [42 Pa.C.S.] section 9795.1 (relating to registration) and who is determined to be a sexually violent predator under section 9795.4 (relating to assessments) due to a mental abnormality or personality disorder that makes the person likely to engage in predatory sexually violent offenses." *Id.*[2] This definition requires that testimony adduced at the SVP hearing satisfy three distinct elements. *See Commonwealth v. Dixon*, 907 A.2d 533, 536 (Pa.Super.2006). To establish a "mental abnormality" or "personality disorder," the evidence must show that the defendant suffers a "congenital or acquired condition ... that affects the emotional or volitional capacity of the person in a man-

ner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons." 42 Pa.C.S. § 9792. Moreover, the evidence must establish that the defendant's conduct was "predatory." *See Dixon*, 907 A.2d at 536. Predatory conduct is defined as an "act directed at a stranger or at a person with whom a relationship has been initiated, established, maintained or promoted, in whole or in part, in order to facilitate or support victimization." *Meals*, 912 A.2d at 218–19 (quoting 42 Pa.C.S. § 9792). Finally, the evidence must demonstrate the defendant's propensity to reoffend. *See Dixon*, 907 A.2d at 536 (quoting *Commonwealth v. Bey*, 841 A.2d 562, 566 (Pa.Super.2004) ("This Court has determined that the 'salient inquiry' for the trial court is the 'identification of the impetus behind the commission of the crime,' coupled with the 'extent to which the of-

---

1. The Court's application of this heightened burden of proof arises from the coalescence of social policy with the constitutional imperative of due process. *See Commonwealth v. Williams*, 557 Pa. 285, 733 A.2d 593, 605 (1999) ("This Court has mandated an intermediate standard of proof—'clear and convincing evidence'—when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money.' Notwithstanding 'the state's civil labels and good intentions,' the Court has deemed this level of certainty necessary to preserve fundamental fairness in a variety of government-initiated proceedings that threaten the individual involved with 'a significant deprivation of liberty' or 'stigma.' ").

Because potentially dire consequences follow determination and registration as an SVP, *see Williams*, 733 A.2d at 607 ("One's livelihood, domestic tranquility and personal relationships are unquestionably put in jeopardy by the notification provisions."), application of and adherence to the "clear and convincing evidence" standard is imperative. *See also id.* at 606 (reasoning that because the assessment of the future dangerousness of a

particular registrant is "an undertaking 'involving substantial uncertainty[,]' " the risk to the defendant of an incorrect designation must be limited to the extent possible consistent with the state's competing interest "in protecting its citizens by giving prompt notification to potential victims and relevant caregivers"). Thus, to affirm a determination of SVP status, "we must be able to conclude that the factfinder found clear and convincing evidence that the individual is a sexually violent predator." *Commonwealth v. Krouse*, 799 A.2d 835, 842 (Pa.Super.2002) (en banc) (*overruled on other grounds in Meals*, 912 A.2d at 223).

2. *See also Krouse*, 799 A.2d at 842 ("[T]he SVP classification does not automatically apply to an individual convicted of a sexual offense or even to individuals who have molested a child. Rather, the SVP classification has been specifically limited by the legislature to those offenders who have a 'mental abnormality or personality disorder that makes [them] more likely to engage in predatory sexually violent offenses.' ").

fender is likely to reoffend.' ")). Consequently, "every Commonwealth expert who testifies that an individual is an SVP must examine, and render an opinion on, whether the individual is likely to re-offend." *Id.* at 539.

¶ 4 I do not agree with the Majority that Dr. Ziv's testimony and diagnosis, which was based solely upon Fuentes's criminal record, establishes each of these elements of the SVP classification. Although the trial court apparently found Dr. Ziv credible, elements of her testimony are not legally competent and cannot, as a matter of law, be deemed "clear and convincing evidence." This issue stands at the heart of Fuentes's claim. Brief for Appellant at 26–27 ("Dr. Ziv's opinion, by default, is simply her best guess—she looked at the very limited record provided, considered limited factors, and then, out of little more than thin air, opined that appellant was likely to engage in future predatory sexually violent offenses following his release.").

¶ 5 I recognize that generally the opinions of an expert are themselves evidence and that a defendant's challenge to them is more usually to be directed to evidentiary weight than to sufficiency. *See Commonwealth v. Feucht*, 955 A.2d 377, 382 (Pa.Super.2008) (*citing Meals*, 912 A.2d at 223) ("[A] Board report or opinion that the individual has an abnormality indicating the likelihood of predatory sexually violent offenses is itself evidence."). Nevertheless, to the extent the assessment of the Board member tendering the SVP assessment constitutes expert opinion, *see Meals*, 912 A.2d at 224 (quoting *McMahon v. Young*, 442 Pa. 484, 276 A.2d 534, 535 (1971)), that assessment and the Board member's testimony concerning it must conform to the Rules of Evidence governing expert opinion testimony.

¶ 6 Rule 703 provides affirmative direction on this point, prescribing "a threshold for admission of expert testimony dependant upon the extent to which the expert's opinion is based on facts and data[.]" *Helpin v. Trustees of University of Pennsylvania*, 969 A.2d 601, 617 (Pa.Super.2009).

### Rule 703. Bases of opinion testimony by experts

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Pa.R.E. 703. Consistent with this Rule, "expert testimony is incompetent if it lacks an adequate basis in fact." *Helpin*, 969 A.2d at 617 (citing *Viener*, 834 A.2d at 558). The Rule provides specifically as follows:

"While an expert's opinion need not be based on absolute certainty, an opinion based on mere possibilities is not competent evidence. This means that expert testimony cannot be based solely upon conjecture or surmise." [*Viener*, 834 A.2d at 546]. Rather, "[an expert's] assumptions must be based upon such facts as the jury would be warranted in finding from the evidence." *Id.*

*Helpin*, 969 A.2d at 617.

¶ 7 Only if evidence is competent to begin with can it be deemed "so clear, direct, weighty and convincing" as to enable the factfinder to reach "a clear conviction, without hesitancy, of the truth of the precise facts" at issue. Directly stated, an SVP designation can only be based on competent evidence that each of the specified elements of section 9795.4(e)(3) is es-

tablished—*efforts by the Commonwealth to cloak inadequately substantiated assertions under the mantle of expert opinion will not suffice for this purpose.* Just as the opinion of an expert in any other proceeding, either civil or criminal, is subject to disqualification if rendered without an adequate basis derived from demonstrable facts, so must the opinion of an SVP Board member or other expert conducting an evaluation of a sex offender.

¶ 8 Bearing this standard in mind, I do not find sufficient competent evidence to support Dr. Ziv's testimony on several critical points and, on others, I find her inferences contradicted by facts of record. As a consequence, I would find her opinion deficient as to both the determination of mental abnormality of antisocial personality disorder and the likelihood that Fuentes is "likely to engage in predatory sexually violent offenses." 42 Pa.C.S. § 9792. As a starting point, I note that in reaching an assessment of Fuentes's potential for future sexually predatory behavior, Dr. Ziv opined that the absence from his record of any prior sex offense is "totally irrelevant in terms of criteria for a specific paraphilia."[3] N.T., 2/29/08, at 25. Attempting to buttress her opinion on cross-examination, Dr. Ziv then offered a guess on which the trial court expressly relied in reaching its own determination: "it is *unlikely* that [Fuentes], this is the first and only time that he's acted in a deviant sexual way." Trial Court Opinion, 10/3/08, at 2–3 (quoting N.T., 2/29/08, at 25–26) (emphasis added). Unfortunately, Dr. Ziv's assertions on this point, which bears on the ultimate

issue in her evaluation, are the rankest sort of speculation. Nothing in the background information the doctor cited offered any basis for the suggestive testimony she rendered, which appears to reach a conclusion based not on what the record showed but instead on what it did not show. N.T., 2/29/08, at 24 ("[M]y not being able to render a diagnosis of a paraphilia in this case doesn't mean he doesn't have a paraphilia."). Nevertheless, this freighted appraisal appears to be the only factor beyond Fuentes's guilty plea that Dr. Ziv acknowledged in reaching her determination that Fuentes was likely to engage in future acts of sexual violence. N.T., 2/29/08, at 21–22. Based upon our case law and the Rules of Evidence, this simply is not enough for a competent assessment.

¶ 9 Concerning the second of the statutory criteria, *i.e.*, the extent to which the defendant is afflicted by a personality disorder that makes him more likely to reoffend, Dr. Ziv conceded that she examined only Fuentes's criminal records, which included three juvenile adjudications, one adult conviction and two other adult arrests in which the charges were later dismissed. Not surprisingly, these records suggested a propensity toward criminal acts. Indeed, Dr. Ziv based her conclusion of Antisocial Personality Disorder on little more than the three juvenile adjudications, the first committed when Fuentes was only 12 and the remaining two which resulted from "unauthorized use of a motor vehicle."[4]. Although the crimi-

---

**3.** The current version of the DSM–IV, describes paraphilias as conditions "characterized by recurrent, intense sexual urges, fantasies, or behaviors that involve unusual objects, activities, or situations and cause clinically significant distress or impairment in social, occupational, or other important areas of functioning." American Psychiatric Association. (2000). *Diagnostic and sta-*

*tistical manual of mental disorders* (4th ed., text rev.). Washington, DC: Author., p. 535.

**4.** Unauthorized Use of a Motor Vehicle, 18 Pa.C.S. § 3928, is defined as "operat[ing] the automobile, airplane, motorcycle, motorboat, or other motor-propelled vehicle of another

nal report on which Dr. Ziv relied sets forth the charges and their respective dispositions, *there are no factual allegations to accompany the report. Id.* at 21 ("Q. You were provided some information as to what the outcome was, either adjudication or convictions, correct, but you were not actually provided any of the police reports or documents from any of his other arrests, correct? ... A. I believe that I was not."). Moreover, Dr. Ziv gave no indication of having benefited from any form of pre-disposition investigation germane either to the juvenile offenses or to Fuentes's single adult conviction. In addition, she conceded that she had no access to Fuentes's school records or any information on his juvenile placements. *Id.* at 22. Having reviewed the same materials that Dr. Ziv had available, I cannot discern any of the facts underlying Fuentes's adjudications or conviction—and neither could Dr. Ziv. Consequently, the opinion she derived from them that *Fuentes suffers from Antisocial Personality Disorder is questionable* and can be sustained only by reference to broad generalizations based on assertions of fact that are either incorrect or unsubstantiated.

¶ 10 This deficiency is evident in Dr. Ziv's discussion of the criteria from the DSM–IV on which she relied to reach her conclusion that Fuentes displays Antisocial Personality Disorder and is therefore rendered more likely to re-offend. Dr. Ziv found that Fuentes displayed "a pervasive pattern of disregard for and violation of the rights of others occurring since age 15 years, as indicated by:" (1) "Appellant's failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest;" (2) "Deceitfulness," as indicated by "repeated lying, use of aliases or conning others for personal profit or

pleasure;" (3) Impulsivity or failure to plan ahead (*i.e.,* "Mr. Fuentes'[s] life has been characterized by impulsivity with respect to his unlawful behaviors"); (4) "[R]eckless disregard for safety of self or others" based upon his conviction in the within action; and, (5) "Consistent irresponsibility," as indicated by "repeated failure to sustain consistent work behavior or honor financial obligations." N.T., 2/29/08, at 9–11. Dr. Ziv supported her conclusion further by reference to Fuentes's adjudication of delinquency at age 12, which she deemed (admittedly without access to the details of the offenses at issue) to constitute evidence of a "conduct disorder before age 15." *Id.* at 11.

¶ 11 Considered closely, Dr. Ziv's discussion of these factors appears to be an analytical house of cards. Concerning Fuentes's "repeatedly performing acts that are grounds for arrest," Dr. Ziv failed to draw any connection between Fuentes's acts and the likelihood that he will commit another sex offense, *which is the essence of the evaluation she undertook. See Meals,* 912 A.2d at 215–16; *Dixon,* 907 A.2d at 536. While Fuentes had three adjudications as a juvenile and one conviction as an adult, these crimes consisted substantially of misdemeanor property violations (*e.g.,* unauthorized use of a motor vehicle). In the absence of an explanation from Dr. Ziv of the specific predictive value of these offenses to Fuentes's purported predisposition to commit additional sex offenses, the extent to which her conclusion constitutes competent evidence is debatable at best. *See Helpin,* 969 A.2d at 617 ("While an expert's opinion need not be based on absolute certainty, an opinion based on mere possibilities is not competent evidence."). I fail to discern how joyriding in cars, whether stolen or not, establishes a

without consent of the owner." It is graded

as a second degree misdemeanor.

defendant's propensity to commit sex offenses.

¶ 12 Concerning Dr. Ziv's second conclusion, regarding "[d]eceitfulness," as indicated by "repeated lying, use of aliases or conning others *for personal profit or pleasure*," (emphasis added), the records available to the doctor offer no documentation of the specific reasons that Fuentes used the two aliases she described. Consequently, Dr. Ziv had no way of knowing whether Fuentes's use of aliases was motivated by "personal profit or pleasure" as required by the statute or—more likely—the defendant's simple desire to avoid punishment for his conduct. Thus, there is no basis in fact for the doctor's conclusion that this cited factor supports her determination of Anti–Social Personality Disorder. *See id.* ("[E]xpert testimony cannot be based solely upon conjecture or surmise."); *Viener*, 834 A.2d at 558 ("While an expert's opinion need not be based on absolute certainty, an opinion based on mere possibilities is not competent evidence.").

¶ 13 Concerning the fourth cited factor, "repeated failure to sustain consistent work behavior or honor financial obligations," Dr. Ziv admitted that she had no information concerning Fuentes's employment "even though he was reportedly employed at the Washington Distribution Center at the time of his arrest." N.T., 2/29/08 at 10. In fact, the certified record *establishes* that Fuentes was employed *full time* at the Washington Distribution Center. Thus, in this regard Dr. Ziv's conclusion appears to discount a fact highly material to her analysis. *See id.* I can conceive of no valid reason for a sworn expert to dismiss critical information so summarily. The result is apparent in her conclusion—which is simply wrong.

¶ 14 Lastly, to the extent that Dr. Ziv concluded that Fuentes's adjudication of delinquency at the age of 12 constituted "evidence of Conduct Disorder with onset before age 15 years," I find no substantiation, either in Dr. Ziv's professional assessment or in the record. Declaring a proposition does not make it so—even for an expert witness. *See Helpin*, 969 A.2d at 617 (quoting *Viener*, 834 A.2d at 546) (reaffirming that "[an expert's] assumptions must be based upon such facts as the jury would be warranted in finding from the evidence"). By Dr. Ziv's own admission, she had no information on the specific circumstances underlying Fuentes's delinquent acts or his motivation in having perpetrated them. To suggest, on the basis of such exceptionally scant consideration, that a defendant suffered from "Conduct Disorder" at twelve years old is simply untenable. Any number of 12-year-olds find themselves in juvenile court for any number of reasons. Absent substantially more rigorous analysis of their situations than Dr. Ziv provided here, I find the application of any label legally indefensible.

¶ 15 The foregoing discrepancies in Dr. Ziv's testimony are significant, and in my opinion, undermine the evidentiary competence of her related conclusions. Her analysis is thin and her conclusions unsubstantiated. Given the failure of Dr. Ziv's testimony and report to comport with a standard of competence that the Rules of Evidence require even of expert testimony in civil litigation, I would not find sufficient competent evidence to sustain the trial court's SVP determination. *See generally, Commonwealth v. Lipphardt*, 841 A.2d 551, 554 (Pa.Super.2004) (providing, "the SVP classification does not automatically apply to an individual convicted of a sexual offense"). Thus, I would reverse the trial court's designation of Fuentes as a Sexually Violent Predator and discharge all requirements attendant to that designation.

Because the Majority declines this course, I must respectfully dissent.